IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Briefs December 29, 2000

IN THE MATTER OF: JALEESA CHANTELLE DAVIS

A Direct Appeal from the Juvenile Court for Shelby County
No. 11439     The Honorable A. V. McDowell, Special Judge

———————

No. W1999-01662-COA-R3-CV - Filed March 1, 2001

———————

The Shelby County Juvenile Court terminated parental rights of the natural mother and father of minor child. Parents have appealed. We affirm.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Scot A. Bearup, Memphis, For Appellant, Angela Busigo

Andrew Bernstein, Memphis, For Appellant, Curtis Davis

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, For Appellee, State of Tennessee, Department of Children's Services

**OPINION**

Respondents, Angela Busigo and Curtis Davis, mother and father of Jaleesa Davis, a minor child, appeal the order of the juvenile court terminating their parental rights. On November 22, 1996, the Department of Children's Services (DCS) filed a petition averring that Jaleesa Davis, born January 30, 1996, was a "dependent and neglected" child within the law of Tennessee. The petition represents that Jaleesa was admitted to St. Francis Hospital and diagnosed as "failure to thrive" and that Jaleesa's physician reported that her mother, Angelo Busigo, is presently not capable of caring for her. The petition further averred that DCS attempted to contact the mother, however, was unsuccessful. The father, Curtis Davis, was incarcerated at the time the petition was filed. The petition states that circumstances created a threat of severe harm to Jeleesa, and that the placement of Jeleesa in a foster home was in her best interests.

On December 17, 1996, the juvenile court found that Jaleesa was dependant and neglected and that reasonable efforts had been made to prevent removal from the home and that foster care placement was in Jaleesa's best interest. On July 22, 1997, the juvenile court recommended that Jaleesa remain in foster care and that the goal on the plan of care was to return her to her parents. On February 24, 1998, the court ordered that Jaleesa remain in foster care. The matter was continued until April 29, 1998, for a possible change of goal on the plan of care to adoption. A hearing was held on April 28, 1997, and an order entered recommending that Jaleesa remain in foster care. The goal on the plan of care was changed to adoption. Court Appointed Special Advocate, (CASA), was appointed for permanency planning for the placement of Jaleesa.

On November 9, 1998, CASA filed a petition for the termination of the parental rights of Angela Busigo and Curtis Davis pursuant to T.C.A. § § 36-1-113(g) and 37-2-403(2). The petition alleged that for a period of four (4) consecutive months immediately preceding filing of the petition, respondents had abandoned the child in that they had willfully failed to visit and willfully failed to support or make reasonable payments toward the support of Jaleesa. The petition states that Jaleesa had been removed from the home of her mother, Angela Busigo, as the result of a finding by the juvenile court that she was "dependent and neglected" as defined in T.C. A § 37-1-102 and was placed in the custody of the DCS. The Petition further asserts that pursuant to T.C.A. § § 36-1-113(g)(2) and 37-2-403, both Ms. Angela and Mr. Davis have substantially failed to comply with the statement of responsibilities contained in the permanency plan. The Petition alleges that pursuant to T.C.A. § 36-1-113(g)(3)(a) the child has been removed from the custody of her parents by the court for at least six months and that the conditions that led to her removal or conditions which would in all probability cause her to be subject to further abuse or neglect and which prevent her return to the care of the respondents still persist. The petition further asserts that in accordance with T.C.A.§ 36-1-113 (g)(7)(B), Ms. Busigo is incompetent to adequately provide for the further care and supervision of the child because her mental condition is presently so impaired, and it is likely to remain so, that it is unlikely that she will be able to assume or resume the care and responsibility for the child in the near future. The petition avers that termination of both respondents' rights is in the best interest of the child.

On November 9, 1998, the juvenile court appointed an attorney ad litem for Angela Busigo, an attorney ad litem for Curtis Davis, and a guardian ad litem for Jaleesa. The guardian ad litem filed an answer and report and a supplemental report which stated her opinion that the parental rights of Mr. Curtis and Ms. Busigo should be terminated.

The matter was heard in juvenile court in February 1999.[1] Neither parent testified at the hearing. Renee Brotherton, a licensed clinical social worker and treating therapist for Angela Busigo, testified in her behalf. Dr. Brotherton stated that she began to treat Ms. Busigo on February 16, 1998, at her request for assistance to regain custody of her child. Ms. Busigo presented to Dr.

---

[1] The transcript of the hearing reflects hearing dates in December of 1999, however, since the order by the juvenile court terminating the parental rights was entered on February 11, 1999, and the appeal was taken on February 17, 1999, we conclude that the hearing actually took place in February 1999, as indicated by the order.

Brotherton a plan of care dated March 18, 1998, that had been generated by DCS, including goals that Ms. Busigo was to achieve in order to regain custody of Jaleesa. The responsibilities assigned to Ms. Busigo in the plan included that she be able to understand instructions from doctors regarding the care of Jaleesa. Dr. Brotherton was not able to comment on how she has progressed in this area, as she has not had the opportunity to observe her in following any medical instructions. Dr. Brotherton described the two occasions that she witnessed Ms. Busigo's visitation with her daughter in June of 1998, as "not problematic."

Returning to the plan of care, Dr. Brotherton stated that the parents are identified with a history of involvement in negative activities in the community. The plan sets a goal that the parents would be viewed in a more positive light in the community. Additionally, the plan of care states that the parents have some problems in their relationship, and sets a goal that the relationship become stronger. Dr. Brotherton testified that in therapy they addressed the arguing and lack of emotional support and the amount of time that Mr. Davis spends away from home.

With regard to the plan's goal that the parents show that they can meet Jaleesa's nutritional needs as Jaleesa had been diagnosed as "failure to thrive" when she came into foster care, Dr. Brotherton stated that she was aware that Ms. Busigo has taken a parenting class, earning a certificate that she has shown to Dr. Brotherton. On occasion, Ms. Busigo quoted various instructions and information from the class, however, Ms. Busigo's references to the class were not specifically about nutrition. Dr. Brotherton further testified that the plan sets a goal for the parents to bond more closely with Jaleesa and work to improve her developmental skills, however, Dr. Brotherton has only been able to work minimally with Ms. Busigo on this goal, as she has not had visitation with her child for much of the time that they have been in therapy together. Ms. Busigo explained this lack of visitation to Dr. Brotherton stating that she was concerned about the supervising person, and was afraid that their report of her interaction with Jaleesa would be prejudiced against her, and make false accusations because Mr. Davis was not there to witness the supervision.

The plan also required documentation of the parents' participation in the plan of care with the desired outcome that Jaleesa have a permanent home as soon as possible. Dr. Brotherton stated that she had not been inside the home of Ms. Busigo, but had seen the outside of her apartment building, which appeared to be stable housing. As to other issues addressed in therapy, Dr. Brotherton stated that financial responsibility was a main focus, and stated that Ms. Busigo is as stable as she can be given her mental illness, however, Dr. Brotherton stated that she did not feel comfortable with the financial stability considering Mr. Davis' lack of employment.

Over the coarse of treating Ms. Busigo, Dr. Brotherton's contact with DCS included phone conversations, two meetings, and a letter written to the department. Also, Dr. Brotherton confirmed to Ms. Boyd, of DCS, that Ms. Busigo's bipolar disorder appeared to be under control through medications, as verified by a letter from her doctor. In the meetings, Dr. Brotherton addressed the lack of stability in the relationship between Mr. Davis and Ms. Busigo, and informed Ms. Boyd that

this relationship was not as stable as she would like for it to be. She explained that she and Ms. Busigo had explored the possibility of her being on her own.

On cross-examination, Dr. Brotherton agreed that impulsivity is a common trait of bipolar patients, which she states could be harmful when parenting a child. Dr. Brotherton testified that she had been told by a creditable source that Ms. Busigo had periodically panhandled during the time that she was under her care, but she did not observe this behavior. She confirmed that the inability of Ms. Busigo and Mr. Davis to get along, and his inability to stay out of jail and spend time at home would have a negative affect on Jaleesa. Dr. Brotherton stated that DCS did give Ms. Busigo instructions on regular visitation, but she did not follow those instructions. Dr. Brotherton testified that she has only recently learned that Jaleesa is a special needs child, and was not aware of what Jaleesa's needs were when she made her assessment regarding Ms. Busigo's ability to meet her child's needs. When questioned about her opinion regarding Ms. Busigo's parenting, Dr. Brotherton stated that based on her diagnosis, assessment, and continuing therapy with Ms. Busigo, she has the skills necessary to bond with Jaleesa, however, Dr. Brotherton stated that she had reservations about Ms. Busigo regaining custody of Jaleesa at this time.

Ms. Waddell, case manager for DCS, testified that her responsibility is to supervise case managers who work with families of children who are in state custody making sure that the case workers document their files. The first case worker on Jaleesa's case worked from November of 1996 to July of 1997, at which time another case worker, Stephanie Ransom was assigned and worked on the case until she left the department. Ms. Waddell carried the case herself until March of 1998, when Paula Boyd was assigned to the case. Paula Boyd is currently on maternity leave and Ms. Waddell is again the case manager. Ms. Waddell testified that the DCS records indicate that Jaleesa came into custody of the department in 1996, when her mother took her to the hospital and she was diagnosed as "failure to thrive." Shortly after arriving at the hospital, Ms. Busigo left the hospital and was gone for over a day. Upon receiving a telephone call from the hospital, the department looked into the matter and discovered that there were problems with housing and with the mother's mental instability. The situation was further complicated by Jaleesa's diagnosis of "failure to thrive" and a diagnosis at birth of hydrocephalus, which generally means she is slower than other children. The first meeting between DCS and Ms. Busigo was held in December of 1996, attended by Ms. Deerbum, the case manager, and Ms. Busigo. Ms. Deerbum told Ms. Busigo that they would work toward goals that could help her make improvements so that the child could return home. At that time, a plan of care was drawn up and completed on December 16, 1996. Pursuant to the plan of care, Ms. Busigo was required to attend parenting classes. The DCS files indicate that Ms. Busigo had previously attended parenting classes, however the files do not contain reports from any classes attended. The second thing that Ms. Busigo was required to do was to provide adequate housing for her daughter, which Ms. Waddell testified was accomplished. The third requirement on the plan was that Ms. Busigo contact DCS and schedule regular visitation with her daughter. Ms. Waddell testified that Ms. Busigo has scheduled some visitation, but that it has been very limited. The files indicate that in December of 1996, Ms. Busigo visited Jaleesa at "Sarah's Place." Another visit was scheduled for February 13, 1997, but on February 11, 1997, Ms. Busigo called and cancelled the visit. On February 28, 1997, Ms. Busigo called to set up a visit which was scheduled

for March 6, 1997, and on March 5, 1997, the case manager went to the mother's home to leave a note reminding her of the visit, however, DCS did not hear from Ms. Busigo, and there was no visit on March 6. On March 7, 1997, Ms. Busigo called again and a visit was scheduled for and attended on March 20, 1997. On March 31, 1997, Ms. Busigo scheduled a visit for April 24, 1997, however, that visit was rescheduled and occurred on May 8, 1997. Another visit occurred on June 11, 1997, in the office of Dr. Bishop, her therapist at that time. From the time that Ms. Deerbum left, until another case manager was assigned, Ms. Waddell was responsible for the case. Ms. Waddell testified that Ms. Busigo maintained fairly regular contact during that time and wanted to visit with her child. Ms. Waddell arranged for a Community Service assistant, Dorothy Nelson, to pick up Jaleesa and take her to visit with her mother. The next visit took place on October 2, 1997, at the Child Advocacy Center, as Ms. Busigo had requested that the visits not be at her house. Subsequently, Ms. Busigo complained to Ms. Waddell about Ms. Nelson, and requested another case manager, to which Ms. Waddell responded that she had no case manager to assign other than herself, and she needed Ms. Nelson to help with visitation. [2] There was a visitation scheduled for November of 1997; however, there was no one at home and a note on the door stating that Mr. Davis had gone to the hospital on the night before, and that they had locked their keys in the house. Ms. Waddell testified that there was no visitation from November of 1997 through March 18, 1998, when the plan of care was discussed and a visitation took place by Ms. Busigo and Mr. Davis. The new plan of care stated that the Susanna Center, where Jaleesa was in treatment for developmental delay, had agreed to have visitation on a weekly basis, which would help in their assessment of Jaleesa. In April of 1998, there were two visitations at the Susanna Center, one with both Ms. Busigo and Mr. Davis, and one with only Ms. Busigo. The Susanna Center reported that Ms. Busigo was very demanding of their time and took teachers away from students, causing an imbalance in the program. The Susanna Center opted to discontinue the visitations. Ms. Busigo had been advised prior to these visitations that if there was any disruption in the classrooms, visitations could not continue there. On June 2, 1998, a visitation took place in Dr. Brotherton's office with Ms. Busigo, at which time the plan of care was discussed. On June 11, 1998, there was a second visitation by Ms. Busigo at Dr. Brotherton's office. There was a third visit on June 18, 1998, at Dr. Brotherton's office attended by Ms. Busigo. Since the visit on June 18, 1998, through the time of trial, neither Ms. Busigo nor Mr. Davis has had visitation with Jaleesa. In July of 1998, Ms. Busigo called DCS three times and asked that the plan of care be changed. When asked to schedule visitation, Ms. Busigo stated that she would not see Jaleesa that week, but would keep in touch. The next contact was a telephone message that Mr. Davis had called on August 10, 1998. A case manager returned his call the same day, and responded to his question regarding when they would get Jaleesa back stating that it did not look good when there had been no visits with the child. Mr. Davis explained that there had been no visits because Ms. Busigo wanted to have things her way, and that if she could not have visitation in Dr. Brotherton's office, she would not have them. Mr. Davis was told that CASA was working on termination of parental rights and verified that Mr. Davis had legitimated Jaleesa.

---

[2] Ms. Nelson had given Ms. Busigo her home telephone number in the event that something came up, however, Ms. Busigo abused the information by calling Ms. Nelson many times over the weekend. Ms. Nelson informed her that she was not working in any capacity other than business, to which Ms. Busigo responded in anger, reacting negatively and stated that she did not understand that Ms. Nelson was not a case manager.

Regarding the goals contained in the original plan of care and the plan revised in July of 1997, Ms. Waddell testified that Ms. Busigo met all of the requirements with the exception of the visitation. The plan was again revised in March of 1998, and included responsibilities for Ms. Busigo to work with her therapist to learn active listening skills, with the desired outcome that she would be able to understand instructions from doctors and other professionals with regard to meeting the needs of her child. This responsibility was specifically included because Ms. Busigo had been instructed by nurses to give Jaleesa plenty of water, however, she had understood the instructions in a different way than they were intended, and gave the child so much water that she was not getting adequate formula, causing the problem of "failure to thrive." Ms. Waddell can not comment on Ms. Busigo's progress regarding her listening skills because she has not had recent contact with her. There was also an instruction added to the plan that Ms. Busigo stop panhandling, primarily because this problem came up in review meetings where various people had witnessed her panhandling and even had been approached themselves. The department had difficulty considering placement of a child in a home where the mother continued this behavior.

Ms. Waddell testified regarding Mr. Davis, stating that the requirement was added that he stay out of jail because he had a history of going to jail, however, she reports that he has not met his requirement. Another responsibility was added that the parents would work with the therapist to improve their relationship. This was added at Dr. Brotherton's suggestion because the conflict between the parents was significant, and she was concerned that if they could not get along, they could not care for the child. To Ms. Waddell's knowledge, this has not progressed. The plan also required that during visitation the parents provide adequate food to meet Jaleesa's nutritional needs. This requirement was not met. The last requirement was that the parents visit Jaleesa at the Susanna Center at least once a week and participate in the program to help Jaleesa improve her developmental skills. Ms. Busigo went to the Susanna center only two times before the center requested that the visitations be discontinued, as she was disruptive and did not comply with their rules.

Ms. Waddell testified that Ms. Busigo has not acquired the parenting skills that she wanted her to acquire when she originated the plan of care, is deficient in her visitations on a regular basis, and unable to redirect the child without someone else there to give her instruction. Ms. Busigo has not had visitation since June 18, 1998, over four months. The only goal that Ms. Waddell thinks that Ms. Busigo has done to the best of her ability has been her attendance of therapy sessions, however, she does not see major changes with regard to her ability to parent. Mr. Davis has not had many visitations with Jaleesa, and Ms. Waddell does not believe there to be any sort of bond between the father and the child. In total Ms. Busigo has visited Jaleesa twelve times since she has been in DCS custody, and Mr. Davis has had two or three visits. In contrast, Jaleesa has been with the same foster family since the fall of 1997, who now seek to adopt her. Although Ms. Waddell testified that she has never seen Jaleesa with her foster family, DCS records indicate that there is a very close bond between her and her foster family and that Jaleesa is shown a great deal of care.

The trial court ruled from the bench that there was abandonment on the part of both parents. The court found it in the child's best interest that both parents' rights be terminated and that custody be with DCS for placement for adoption. An order to that effect was entered on February 11, 1999,

terminating the parental rights of Ms. Busigo and Mr. Davis and including findings of fact in pertinent part:

1. The Respondents have for a period of four (4) consecutive months immediately preceding the filing of this Petition, failed to visit and willfully failed to support or make reasonable payments toward the support of the child.

2. Said child has been removed from the custody of Respondent Busigo by order of this Court for more than two years. Testimony presented indicated that the conditions that existed at the time of removal continue to exist.

3. The evidence presented showed that the Respondents have substantially failed to comply with the ratified Permanency Plan.

The order states that the parents had abandoned the child as defined in T.C.A. § 36-1-102(A) and have substantially failed to comply with the statement of responsibilities in the ratified permanency plan as defined in T.C.A. § 37-2-403. The court further held that in accordance with T.C.A. § 36-1-113(c)(2), the termination of the Respondents' parental rights is in the best interest of the child. In so holding, the court stated that in accordance with T.C.A. § 36-1-113(c)(1), there is clear and convincing evidence to support the termination of parental rights. Both parents have appealed. Ms. Busigo raises four issues on appeal as stated in her brief:

I. The trial court erred in concluding that the Appellants abandoned the minor child.

II. The Department of Children's Services did not satisfy its statutory obligations in exercising "reasonable efforts" to reunite the minor child and Appellants.

III. The trial court erred in concluding that the Department of Children's Services had established grounds for termination by clear and convincing evidence.
A. The trial court erroneously found by clear and convincing evidence that the Appellants abandoned the minor child.
B. The trial court erroneously found by clear and convincing evidence that the Appellants failed to substantially comply with the permanency plans.
C. There was no proof presented by the Department of Children's Services that the conditions that led to the removal of the minor child still exist or cannot be remedied in a timely manner.

IV. There was no proof presented by the Department of Children's Services that termination of Appellant's parental rights would be in the best interest of the minor child.

Mr. Davis presents three issues for review as stated in his brief:

I. The trial court erred in concluding that parents abandoned the child.

II. The trial court erred in concluding that parents have substantially failed to comply with the statement of responsibilities in the Permanency Plan.

III. The trial court erred in concluding that the conditions which led to the removal of child from the parental home or other conditions which in all probability would cause child to be subject to further abuse or neglect still persist and there is little likelihood that the conditions will be remedied at an early date.

Pursuant to T.C.A. § 36-1-113(c)(1)(2) (Supp. 1999), termination of parental rights must be based on a finding by clear and convincing evidence that grounds for termination exist, and that such termination is in the best interest of the child. Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

It is a well established premise that "[a] parent has a fundamental right to the care, custody and control of his or her child." *Department of Children's Servs. v. Wiley,* No. 03A01-9903-JV-00091, 1999 WL 1068726, at *3 (Tenn. Ct. App. Nov.24, 1999) (citing *Stanley v. Illinois,* 405 U.S. 645, 651 (1972)). A parent's right to the care, custody, and control of his or her child is not absolute and may be terminated if justified by clear and convincing evidence under the applicable statute. *In re C.W.W., N.W.W., Z.W.W., & A.L.W.,* No. M1999-01372-COA-R3-CV, 2000 WL 666361, at *6 (Tenn. Ct. App. May 23, 2000) (citing *Wiley,* 1999 WL 1068726, at *3 (citing *Santosky v. Kramer,* 455 U.S. 745, 769 (1982))). Termination of parental rights must be based on a finding by clear and convincing evidence the grounds for termination of rights have been established and the termination of parental rights in is the best interest of the child. T.C.S. § 36-1-113(c)(1) and (2). In addition, in order to terminate parental rights there must be a showing that the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated. *In Re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999) (citations omitted). The Tennessee adoption statues mandate that:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36-1-113, (1999). Regarding the first ground, Tennessee's adoption statues define abandonment as:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child; [or]

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental

rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

* * * * *

(E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

T.C.A § 36-1-102 (1999).

In the resent case *In re C.W.W., N.W.W., ZA.W.W., & A.L.W.* this Court stated "this court has recognized that the existence of any one of the statutory bases will support a termination of parental rights." *In re C.W.W., N.W.W., Z.W.W., & A.L.W.,* No. M1999-01372-COA-R3-CV, 2000 WL 666361, at * 7 (Tenn. Ct. App. May 23, 2000). Therefore, we must affirm the trial court's judgment terminating the parental rights of both Mr. Davis and Ms. Busigo if the record contains clear and convincing evidence to support any basis found by the trial court. *See id.* (citations omitted). Tennessee courts have commented on the standard of clear and convincing evidence stating "[i]n order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence" *See Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

In their first issues, both Mr. Davis and Ms. Busigo contend that the trial court erred in concluding that each had abandoned Jaleesa. The petition for the termination of parental rights alleged that the parents have for a period of four months immediately preceding the filing of the petition "willfully failed to visit and willfully failed to support or make other reasonable payments toward the support of the child." The trial court found that both parents have, for a period of four months preceding the filing of the petition, "failed to visit and willfully failed to support or make reasonable payments toward the support of the child." Regarding the allegation and finding of a willful failure to support, we note the decision of our Supreme Court *In re Swanson,* 2 S.W.3d 180 (Tenn. 1999), holding that in construing the parental rights termination statute the court could not read an element of intent into the definition of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support". The *Swanson* Court held that the statutory

-10-

definitions of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" violated the due process clause of the United States Constitution and the "law of the land" provision of the Tennessee Constitution as they create an irrebuttable presumption that a failure to provide support for four months immediately preceding the filing of a petition to terminate parental rights establishes abandonment, without regard to whether the failure was intentional. *Id.* at 188-89. Accordingly, the **Swanson,** Court found the definition found in T.C.A. § 36-1-102 (1)(D) for "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" was unconstitutional, and that the definition previously in effect, which contained an element of intent both in failure to visit and failure to support shall be applied until the statute is amended. **In Re Swanson,** 2 S.W.3d at 189.

A review of the record indicates that the trial court erred in finding by clear and convincing evidence that the parents willfully failed to support the child. Although it does appear that there was no support provided by either parent, the record does not demonstrate the requisite intent needed for a finding that this failure was willful. However, we do find clear and convincing evidence that both parents willfully failed to visit the child in the four months immediately preceding the filing of the petition. The DCS record and testimony of Ms. Waddell indicate that for the four months immediately preceding the filing of the petition for the termination of parental rights on November 9, 1998, neither parent had visitation with Jaleesa. The last visitation by Ms. Busigo was on June 18, 1998, and she only had twelve visitations in total from the time that Jaleesa was taken into the custody of DCS in November of 1996. The record contains evidence demonstrating that the failure to visit on the part of Ms. Busigo was an intentional failure. She was in touch with DCA during this period and was given ample opportunity to visit Jaleesa, yet opted to forego such opportunities. Ms. Busigo appears to have been uncooperative with the Susanna Center and with Ms. Nelson in efforts to schedule visitations, and it further appears that she discontinued all visitation when she became unhappy with the arrangements. We believe that Ms. Busigo's failure to visit in the four months prior to the filing of the petition demonstrates the intent needed to satisfy the definition of abandonment as a willful failure to visit the child for the four months immediately preceding the filing of the petition. Consequently, with regard to Ms. Busigo, the criteria for abandonment set out in T.C.A.§ 36-1-102(1)( A)(i) has been met.

The last visitation by Mr. Davis appears to have been in March of 1998. There is some confusion in the testimony as to whether there were a total of two or three visits by Mr. Davis. In any event, he had not had a visitation with Jaleesa in the four months immediately preceding the filing of the petition. The petition states that Mr. Davis was incarcerated at the time of the filing of the petition. Pursuant to T.C.A. § 36-1-102(1)(A)(iv):

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or make reasonable payments

-11-

toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Upon a review of the record we are not able to determine the dates of Mr. Davis's incarceration. It appears that he was incarcerated at the time of the filing of the first petition, alleging that Jaleesa was a "dependent and neglected" child. It further appears that he was incarcerated at the time of the filing of the petition for the termination of parental rights. According to the supplemental report of the guardian ad litem, he was not incarcerated on February 10, 1999, the day before the order was entered terminating his parental rights. The record is insufficient in providing any more information regarding the dates of Mr. Davis' incarceration. However, Mr. Davis was fully informed of the grounds for termination relied upon by the petitioner and had the opportunity to deny such allegations. He chose not to appear and testify. In any event, the record is clear from his frequent arrests he shows a wanton disregard for the child's welfare.

Moreover, the evidence does not preponderate against the trial court's finding that the respondents have substantially failed to comply with the responsibilities of the permanency plan. The evidence also does not preponderate against the trial court's finding that the child had been removed to the custody of the respondents for at least six months, and the conditions which led to the removal still persists and would cause the child to be subjected to further abuse or neglect and prevents the child safe return, and that there is little likelihood that these conditions will be remedied. The trial court found that the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home, and the evidence does not preponderate against such findings.

Having found clear and convincing evidence of grounds for the termination of respondents' parental rights, we turn now to the necessary second inquiry: whether such termination would be in the best interest of the child.

According to T.C.A. § 36-1-113(i) (Supp.2000) the following factors, *inter alia,* shall be considered in determining the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In finding that the termination of respondents' rights was in the best interest of Jaleesa, the trial court stated in its order that there was indication by the testimony presented that the conditions that existed at the time of removal of Jaleesa continue to exist and that evidence showed that Mr. Davis and Ms. Busigo "substantially failed to comply with the ratified Permanency Plan." In addition, at the time of trial, the court appointed guardian ad litem filed a report stating that based on a review of the DCS file[3] both parents have a criminal record and the mother has a history of

---

[3] The guardian ad litem's report indicated that upon the filing of the report she was unable to interview Ms. Busigo's therapist due to Ms. Busigo's failure to file a release. The parents had an appointment to meet with the guardian ad litem, however Mr. Davis called to cancel that appointment stating that Ms. Busigo had strep throat. The guardian ad litem has been unable to contact either parent, as Ms. Busigo does not have a telephone, left no number where she could be reached, and requested that all mail go to a post office box. In her supplemental report, the guardian ad litem stated that subsequent to filing her report, and on the day before trial, Mr. Davis and Ms. Busigo appeared at
(continued...)

mental illness (bipolar disorder). It was the guardian ad litem's opinion that the parental rights should be terminated. In her supplemental report the guardian ad litem states that although Ms. Busigo appears to have her bipolar illness under control and has not been hospitalized since June of 1995, she remains concerned about Ms. Busigo's ability to parent, her reliance on Mr. Davis, her behavior regarding the scheduling of their meeting, which she failed to attend, and mostly her absence from Jaleesa's life. Accordingly, the guardian ad litem's recommendation for the termination of rights remained. At trial, the guardian reiterated the findings in her report, stating that the parents had made three appointments with her office, none of which were attended by either parent. Although the cancellations were made on the excuse that Ms. Busigo was ill, the guardian found them suspect as Ms. Busigo appeared at the guardian's office on the day before trial, yet she had left a message on the previous day cancelling an appointment stating that she was going to the hospital. The guardian further stated that although Ms. Busigo appears to have attempted to the best of her ability to comply with the plan of care, she remains concerned in light of the facts that in twenty-seven months, Ms. Busigo had only twelve visitations. In addition the guardian ad litem found it noteworthy that the child is in adoptive placement and is doing very well, and Dr. Brotherton expressed reservations about the mother's ability as a parent.

Upon the evidence, the trial court stated from the bench that it is in the best interest of the child that the parental rights of both parents be terminated, stating in pertinent part:

> ....The Court further finds that the custody has been removed for at least six months and that the conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subject to further abuse or neglect and which would prevent the child's return to the care of respondents still persist. I do see and understand your argument that she made some efforts but I just don't believe that those efforts come up to changing my mind that it is in the child's best interest that the parental rights be terminated and that custody be placed with the Department of Children's Services for placement for adoption.

In the recent case of **In the Matter of B.B.,** No. M1999-00643-COA-R3-CV, 2000 WL 794360 (Tenn. Ct. App. June 20, 2000) involving a mother whose parental rights were terminated upon a finding that she was unwilling and unable to care for the child at present due to "ongoing mental health issues[,]" the middle section to this Court found that the grounds for termination were established and that the termination was in the best interest of the child. Although the facts in that case differ somewhat from the instant case, there are marked similarities between the factors to consider in the instant case, and the factors that the Court in **In re B.B.** considered in determining

[3](...continued)
her office with no appointment. The guardian could not meet with them immediately, and when she did attend to them after a period of approximately ten minutes, she was told by Ms. Busigo that Mr. Davis had left, leaving Ms. Busigo without transportation. She then met with Ms. Busigo for approximately half an hour.

that termination of rights was in the best interest of the child. The child in **In re B.B.** had been removed from the home for more than a year and the mother failed to comply with many of the suggestions made by DCS, blaming various service agencies. The Court found that the failure to make suggested adjustments to the conditions in her home that led to the determination that the child was "dependent and neglected" probably would not change. **Id.** at *9. In addition the child in that case had thrived in the stable environment of her foster home and had received treatment and other services needed for her own problems. **Id.**

Upon a review of the record and considering all the factors enumerated in the T.C.A. § 36-1-113(i)(1) - (9), we find clear and convincing evidence that termination of respondents' parental rights is in the best interest of the child. Moreover it is clear that the respondents are unfortunately not fit to provide adequate care to the child and that there is a risk of substantial harm to the child, both in removing her from her current foster family and in returning her to the care of her parents. The respondents were unable to meet the requirements of the permanency plan to make it safe and in Jaleesa's best interests to return her to her home at present. It does not appear that a lasting adjustment would be possible. The respondents have not maintained regular visitation with Jaleesa. Consequently, there is no indication that a meaningful relationship has been established through vitiation, or by other means. The mother's bipolar condition and her apparent dependency on Mr. Davis, coupled with the proof of their inability to cooperate to the degree needed to raise a child do not indicate an ability to sufficiently provide for Jaleesa, and can reasonably be considered a detriment to her well being. Ms. Waddell and Dr. Brotherton expressed reservation regarding a return of the child to Ms. Busigo at present. The Tennessee General Assembly has determined that where a child's need for a safe, permanent home conflicts with a parent's interest in retaining parental rights, the child's need must prevail. **See In re B.B.** at 10 (citing **Sate Dep't of Human Servs v. Smith,** 785 S.W.2d. 336, 338 (Tenn. 1990).

Under the circumstances, we find that the trial court did not err in finding by clear and convincing evidence grounds for the termination of the respondents' parental rights and that such termination would be in Jaleesa's best interests. Accordingly, the order of the trial court terminating the respondents' parental rights is affirmed. This case is remanded for such further proceedings as may be necessary. Costs of the appeal are equally assessed against appellants, Angela Busigo and Curtis Davis.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.